# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

PRECISION SEED CO., et al.,

                                 :

        Plaintiffs,                      Case No. 3:03-cv-079

                                 :

      -vs-                          Chief Magistrate Judge Michael R. Merz

CONSOLIDATED GRAIN & BARGE
 COMPANY,

                                 :

        Defendant.

---

## DECISION AND ORDER ON DEFENDANT'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

---

This case is before the Court on Defendant's second Motion for Partial Summary Judgment ("Second SJ Motion," Doc. No. 79) which is fully briefed (Doc. Nos. 90, 98).

This case was initially referred to the Magistrate Judge on June 2, 2005, under 28 U.S.C. §636(b) (Doc. No. 83).  On July 12, 2005, the case was, upon the unanimous consent of the parties, referred to the Magistrate Judge under 28 U.S.C. §636(c) (Doc. No. 99).  The case remains set for trial to a jury on May 22, 2006.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no

genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).  Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law.  Fed. R. Civ. P. 50).  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).  If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate.  *Id*.  The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986)). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than *de minimis*.  *Hartsel v. Keys*, 87 F. 3d 795 (6th

2

Cir. 1996).  "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323;  *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted).  If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial.  *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."  *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990).  Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v.*

3

*Commercial Union Ins. Co.,* 260 F.3f 574, 581 (6th Cir. 2001).  "Materiality is determined by the substantive law claim."  *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir. 2000).  An issue is genuine if a "reasonable jury could return a verdict for the nonmoving party."  *Henson v. Nat'l Aeronautics & Space Admin.,* 14 F.3d 1143, 1148 (6th Cir. 1994), quoting *Anderson,* 477 U.S. at 248.  Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact.  *Simmons-Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir. 2000), *rev'd on other grounds,* 536 U.S. 639 (2002).  Thus, a factual dispute which is merely colorable or is not significantly probative will not defeat a motion for summary judgment which is properly supported.  *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied* 510 U.S. 976 (1993); *see also, Int'l Union United Auto., Aerospace & Agriculture Implement Workers of America v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999), *cert. denied* 529 U.S. 1076 (2000).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street,* 886 F.2d at 1479.  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson,* 477 U.S. at 252.  If, after sufficient opportunity for discovery, the non-moving party is unable to meet his or her burden of proof, summary judgment is clearly proper.  *Celotex Corp.,* 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim.  *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir. 2000).  Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enterprises v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir. 1991).

4

The Court may grant summary judgment on the issue of causation when warranted.  *Bailey v. Floyd County Bd. or Education.,* 106 F.3d 135, 145 (6th Cir, 1997).  For example, reliance solely on the fact that an adverse employment decision occurred after the alleged protected conduct is insufficient.  *Id.* at 144-45.  "A mere scintilla of evidence is [likewise] insufficient" to create a genuine issue of material fact.  *Landham v. Lewis Galoob Toys, Inc.,* 277 F.3d 619, 622 (6th Cir. 2000).

The facts set forth in this Decision are admitted or established by evidence competent under Fed. R. Civ. P. 56(e) and not controverted by opposing competent evidence.

In any action in federal court where subject matter jurisdiction is based on the parties' diversity of citizenship or where the claim for relief arises under state law, state substantive law provides the rules of decision.  28 U.S.C. §1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 2d 1188 (1938).  That is the case here except for the Plaintiffs' claim under the Sherman Act.

In applying state law, the Sixth Circuit follows the law of the State as announced by that State's supreme court. *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F. 2d  754, 758 (6th Cir. 1992);  *Miles v. Kohli & Kaliher Assocs.,* 917 F. 2d 235, 241 (6th Cir. 1990). "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Id.;  In re Akron-Cleveland Auto Rental,  Inc.,* 921 F. 2d 659, 662 (6th Cir. 1990); *Bailey v. V & O Press Co.*, 770 F. 2d 601 (6th Cir. 1985); *Angelotta v. American Broadcasting Corp.,* 820 F. 2d 806 (1987).  The available data to be considered if the highest court has not spoken include relevant dicta from the state supreme court, decisional law of appellate courts,  restatements of law, law review commentaries, and the "majority rule" among other States.  *Bailey*, 770 F. 2d at 604. "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on  point, unless it is

convinced by other persuasive data that the highest court of the state would decide otherwise."

*Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989); *accord Northland Ins. Co.*

*v. Guardsman Products, Inc*., 141 F.3d 612, 617 (6th Cir.1998). This rule applies regardless of

whether the appellate court decision is published or unpublished. *See Talley v. State Farm Fire &*

*Cas. Co.*, 223 F.3d 323, 328 (6th Cir.2000); *Puckett,* 889 F.2d at 1485. *Ziegler v. IBP Hog Market*,

249 F.3d 509, 517 (6th Cir. 2001). Of course, federal procedural law governs regardless of the basis

of jurisdiction. *Sibbach v. Wilson*, 312 U.S. 1, 61 S. Ct. 422, 85 L. Ed. 479 (1940).

## Procedural History

This case was initially filed in the Greene County Common Pleas Court and then removed

to this Court on May 12, 2003 (Notice of Removal, Doc. No. 1).  Plaintiffs filed their First Amended

Complaint October 2, 2003, asserting breach of contract, tortious interference with business

relationships, breach of fiduciary duty, fraud, misappropriation of trade secrets, violation of §2 of

the Sherman Act, and conversion (Doc. No. 41).  Defendant then filed its first Motion for Partial

Summary Judgment on the Second, Third, Fifth, and Sixth Claims for Relief (Doc. No. 51).  On

August 4, 2004, Judge Rose granted that Motion in part and denied it in part as follows:

1.     Defendant's Motion was denied in its entirety as to the Sixth Claim for Relief,
       monopolization and attempted monopolization under §2 of the Sherman Act, 15 U.S.C. §2
       (Doc. No. 63 at 21).

2.     As to the Third Claim for Relief on breach of fiduciary duty, Judge Rose held that the parol
       evidence rule applies to the parties' Marketing Plan and that therefore evidence outside the
       Thru-Put Agreement (Exhibit A to Doc. No. 41) could not be considered as to the Marketing
       Plan. *Id*. at 22.  While the parol evidence rule was held not to apply to the Seed Program and

6

Seed Manual, Plaintiffs were held to be precluded by lack of evidence from showing that an oral partnership had been formed with the Defendant, but the Court left open a claim of whether Defendant owed Plaintiffs a fiduciary duty regarding an attempted formation of an oral partnership and any remedies which might be available when negotiations looking toward such a partnership are unsuccessful. *Id*.

3. As to the Fifth Claim for Relief on misappropriation of trade secrets, the Court held the parol evidence rules precluded any evidence that Plaintiffs' Customer List was a trade secret, but that there were genuine issues of material fact on whether the Seed Manual was a trade secret and whether Defendant obtained it in a confidential relationship. *Id*.

4. The Motion was granted in its entirety as to the Second Claim for Relief, tortious interference with business relationships. *Id*.

In conclusion, Judge Rose held:

> The following claims remain to be adjudicated: breach of the Thru-Put Agreement; breach of fiduciary duty with regard to actions that occurred in preliminary negotiations about a partnership involving the Seed Program and Seed Manual; fraud; misappropriation of trade secrets regarding the Seed Manual; violation of the Sherman Act; and conversion.

*Id*. at 23.

In its second Motion for Partial Summary Judgment, Defendant Consolidated seeks dismissal of that portion of the First Claim for Relief (breach of contract) which alleges Defendant breached the Thru-Put Agreement by diverting customers from Plaintiffs' facilities. Consolidated seeks dismissal of the Fourth Claim for Relief (fraud), asserting it owed no duty to disclose its intention to divert customers, the claim is precluded by the parol evidence rule, and Plaintiffs could not have justifiably relied on Consolidated's failure to disclose. Consolidated again seeks dismissal of the Sixth Claim for Relief (§2 of the Sherman Act) and preclusion of certain damages theories which

it asserts Plaintiffs intend to rely on.

## Analysis

Plaintiffs in this case are Precision Seed Company and Martin Land Co., both Ohio corporations with their principal places of business in Greene County, Ohio (First Amended Complaint, Doc. No. 41, ¶¶1 & 2), as well as David Martin, sole shareholder of Precision and a partial shareholder of Martin.  Defendant Consolidated Barge and Grain Company acts as an intermediary between farmers and end users of grain.  Precision Seed operates two storage and grain transfer facilities in Greene County, Ohio, one in Bowersville and one in Jamestown (collectively, the "Facilities").  The Facilities were previously operated by Seaman Grain, Inc., until the summer of 2000 when it was sued by the Ohio Department of Agriculture and Key Bank.  As a result of that litigation, Consolidated and Cargill took over certain agreements that Seaman Grain had with some of the farmers who had been bringing grain to the Facilities.

Martin leased the Facilities from Seaman Grain on September 18, 2000 (Martin Depo. at 236-38).  After protracted negotiations he purchased the Facilities on January 24, 2003, for $186,000.  Meanwhile, Greg Beck, acting on behalf of Consolidated, had sent Martin a Letter of Intent in May, 2001, to memorialize discussions between them about a business relationship between Plaintiffs and Consolidated[1].  Finally, on or about August 29, 2001, Precision and Consolidated entered into the Thru-Put Agreement which is the subject of this litigation (Exhibit A to First

---

[1]The Letter of Intent is referred to at p. 11 of Consolidated's first Motion for Partial Summary Judgment (Doc. No. 51).  However, when the Court attempted to find the letter as an exhibit to the Martin deposition, it discovered that the deposition transcript had been filed without the exhibits.  The Court requested a copy from Mr. Portune and received a document labeled Defendant's Exhibit 23 to Martin Deposition, but which refers to Consolidated and unknown entity, Bluegrass Grain.  This Exhibit adds nothing to the Court's analysis.

Amended Complaint, Doc. No. 41).   A First Amendment to Thru-Put Agreement was entered into

on December 15, 2001.  *Id.*, Exhibit B.  The Agreement has a term of three years, ending August 31,

2004, but gives Consolidated a right of renewal for two additional three-year terms.  Agreement, ¶1.

However, Martin sold the Facilities in October, 2004.

The Agreement requires Precision to maintain a capacity to store at least one million bushels

of grain at the Facilities.  *Id.* at ¶ 2a.  Precision is required to provide all necessary labor and

equipment to handle the movement of grain into and out of the Facilities and to dry and condition

the grain.  *Id.* at ¶ 2b.  Precision is required to accept all grain tendered by Consolidated at the

Facilities.  *Id.* at ¶2a.  Conversely, Consolidated is given the "exclusive right to store Grain[2] at the

Facilities and to use all grain storage capacity at the Facilities" and the exclusive right to buy grain

from others at the Facilities.  *Id.* at ¶ 4a, 4b.  Consolidated also is given the exclusive right to

establish the work days and hours at the Facilities.  *Id.* at ¶4e.

As payment for the rights given to Consolidated, Precision is to be paid a Base Handling Fee

of .10 per bushel for the first million bushels and an Excess Handling Fee of .07 per bushel

thereafter during the initial term plus .05 per bushel for any Identity Preserved grain.  *Id.* at ¶6a.  For

the first year, Precision is to be paid in addition a Storage Fee of $250,000.  *Id.* at ¶6b.  After the first

year, the Storage Fee is to be renegotiated.  *Id.*

**First Claim for Relief: Breach of Contract**

One of Plaintiffs' claims of breach of the Thru-Put Agreement is that Consolidated had an

obligation, implicit in the Agreement, "to use Precision to handle its grain processing needs" which

---

[2]"Grain" is a defined term in the Thru-Put Agreement.

9

Consolidated breached when it "intentionally diverted farmers away from the Facilities in part to avoid its obligation to pay Precision the Handling Fee." (First Amended Complaint, Doc. No. 41, at ¶76.)

Consolidated denies this implicit obligation. It points first of all to Section 3 of the Agreement which provides:

> No Maximum or Minimum Quantities: Consolidated shall not be required to put a minimum quantity of Grain through the Facilities on either a daily basis or over the entire term hereof. Precision is not entitled to establish any maximum quantity of Grain which Consolidated can require it to put through the Facilities on either a daily basis or over the entire term hereof, provided, however, that the total amount of Grain stored by Consolidated cannot exceed Precision's existing permanent grain storage capacity at any one time.

It claims that Mr. Martin has unequivocally adopted its interpretation of ¶3 of the Agreement when he admitted at his deposition that Consolidated did not have a minimum throughput requirement on a daily, monthly, or yearly basis (Martin Depo. at 329) and when he admitted that Consolidated had a right to put zero grain through the Facilities. *Id*. at 333.

Consolidated asserts three grounds for summary judgment on this implicit contract claim (Second SJ Motion, Doc. No. 79, at 8-9). It asserts the claim is precluded by the parol evidence rule as applied by this Court in deciding its first Patrial Summary Judgment Motion, that a corollary to the parol evidence rule excludes implied contracts, and that the Court's dismissal of the Second Claim for Relief necessarily implies it did nothing improper in diverting customers.

In response, Plaintiffs rely first on *Illinois Controls, Inc., v. Langham*, 70 Ohio St. 3d 512, 639 N.E. 2d 771 (1994)(Memorandum in Opposition, Doc. No. 90, at 8). In that case, relying on *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917)(Cardozo, J.), the Ohio Supreme Court held that a contract giving a person the exclusive right to market a product implies a duty on that person to expend reasonable efforts to generate sales of the product. *Illinois Controls*

10

is inapposite to this case because Consolidated did not obtain any exclusive right to market the Facilities, but rather the exclusive right to use them for the handling of grain.  In both *Illinois Controls* and *Wood*, the sole opportunity of the person whose product was being marketed to obtain a profit was through the sale of the goods being marketed.  Here, Precision was entitled to the basic storage fee whether or not Consolidated put any grain through the Facilities.  In other words, the commercial situations – from which the applied duty arises – are entirely different.

Secondly, Plaintiffs argue that "the plain language of Paragraph 3 requires CGB to exercise best efforts in originating grain through the Facilities."  (Memorandum in Opposition, Doc. No. 90, at 9).  On the contrary, neither the language of section 3 nor anything else in the Thru-Put Agreement says anything about use of best efforts by Consolidated.  Plaintiffs make a cogent argument that the actual language of section 3 is consistent with a best efforts obligation because it plainly says Consolidated is not required to meet any minimum, but it is a long way from this language's being consistent with a best efforts requirement to this language's imposing such a requirement.

Thirdly, Plaintiffs argue that section 3 cannot be read in isolation from the balance of the Thru-Put Agreement and the contract as a whole imposes a best efforts obligation on Consolidated. Plaintiffs are certainly correct that contracts should be interpreted as a whole.  However, none of the additional provisions cited by Plaintiffs give meaningful support to its interpretation of section 3. The second "whereas" clause stating Consolidated's purpose "to have its grain stored, elevated, and handled at the Facilities" does not imply an intention to have all its grain processed there, given that Mr. Martin knew then that Consolidated processed grain at many different facilities in this country. But if not all, how much?  The most natural reading of the clause is that Consolidated's purpose in entering into the contract is that it wants to have some of its grain processed there.

Plaintiffs offer an extended analysis of the applicability of the parol evidence rule to

11

interpretation of the contract (Memorandum in Opposition, Doc. No. 90, at 14-20).  It notes that

parol evidence is "admissible to clarify the parties intentions where the terms of the contract are

'unclear or ambiguous, or where the circumstances surrounding the agreement invest the language

of the contract with a special meaning.'" *Id*. at 15-16, quoting *Kelly v. Medical Life Ins. Co.*, 31 Ohio

St. 3d 130, 132, 509 N.E. 2d 411, 413 (1987).

      Having argued that exceptions to the parol evidence rule are applicable here, Plaintiffs then

point to the extrinsic evidence on which they rely, Mr. Martin's deposition testimony which is

reproduced at pages 24-27 of the Memorandum in Opposition and then analyzed at pages 27-29.

In the course of that testimony, he admits that on his reading of section 3, Consolidated was under

no obligation to put a minimum amount of grain through the Facilities and that Precision was to get

the minimum storage fee ($250,000 in the first year) even if no grain was put through.  He then

answers that it is his contention that Consolidated had an implied duty to process some minimum

amount and that Consolidated did not have the right just to have grain shipped to its facilities in

Cincinnati if it was in Consolidated's best financial interest to do so.  He also claims that if putting

the grain through the Facilities was not in the best interest of the farmers who grew the grain, "it

would depend.  If you're in an agreement with somebody and if you have a situation like that then

I believe you would sit down and work through a scenario like that."  Quoted *Id*. at 26.

      Additionally, Plaintiffs rely on Mr. Martin's June 20, 2005, Affidavit (*Id*. at Exhibit E).

There he avers in pertinent part:

> 5.  My understanding of paragraph 3 of the Thru-Put Agreement at
> the time I executed it, at the time of my deposition testimony and
> as of today's date, is that Consolidated Grain and Barge did not
> have the option to put zero grain through the Facilities.

> 6.  My intent with respect to paragraph 3 of the Thru-Put Agreement
> was that, while not obligating Consolidated Grain and Barge to
> put a minimum amount of grain through the Facilities on a daily
> basis or over the term of the Agreement due to the inherent

> uncertainties of farming and crop production, the grain that was
> originated in the area, whatever the numbers or amount, would be
> put through the Facilities.

This testimony is plainly insufficient to ground the position taken by Plaintiff in the Memorandum in Opposition that Consolidated had a best efforts obligation to market the Facilities – even Plaintiff Martin does not say he ever understood that to be Consolidated's implied duty.

Moreover, the testimony is insufficient to create a genuine issue of material fact on the claim that Consolidated had a contractual duty not to divert grain to other facilities.  Mr. Martin does not testify that he ever disclosed to Mr. Beck or anyone else negotiating on behalf of Consolidated that he understood they had to use his Facilities for all the grain generated "in the area" (whatever that might mean).  He does not begin to suggest that Mr. Beck or anyone else on behalf of Consolidated ever suggested that was their understanding of the language of the Thru-Put Agreement or that that was the objective of either party in entering into the Thru-Put Agreement. Under Plaintiffs' best case, then, assuming the parol evidence rule does not bar Mr. Martin's testimony, the jury would hear about Mr. Martin's present interpretation of the contract, which he claims he held but does not claim he disclosed at the time he entered into the contract.  It would hear no corroboration of this alleged intent from anyone else involved in the negotiations.  In other words, this is not a situation where the proffered parol evidence discloses what the parties meant by certain language or any usage in the trade which might explain the language, but instead the jury would be invited to allow one party to the contract to retroject a later-expressed understanding of one of the parties into the contract interpretation, one which would change dramatically the expressed contractual obligations.

It is precisely to avoid results such as these that parties put integration clauses into their

contracts, such as the one found at section 26 of the Thru-Put Agreement.[3]  It is precisely to avoid

such results that the parol evidence rule was devised.  As to Plaintiffs' claim that Consolidated

breached the Thru-Put Agreement either by not using its best efforts to market the Facilities or by

diverting potential customers of the Facilities to other grain storage facilities, there is no genuine

issue of material fact and Defendant is entitled to judgment as a matter of law.

**Fourth Claim for Relief: Fraud**

Defendant also seeks summary judgment on part[4] of Plaintiffs' Fourth Claim for Relief.

Plaintiffs aver:

> 171.  Notwithstanding its duty not to conceal such fact, during the course of its business negotiations and relationship with Precision, CGB concealed from Precision that it intended to divert Facilities Customers away from the Facilities.
>
> 172.  Notwithstanding its duty not to conceal such fact, during the course of its business negotiations and relationship with Precision, CGB concealed from Precision that it intended to use the Customer List to gain direct access to Facilities Customers in a way that would benefit CGB to the extreme detriment of Precision.
>
> 173.  Notwithstanding its duty not to conceal such fact, during the course of its business relationship with Precision, CGB concealed from Precision that it never intended to honor the partnership agreement that it had established with Precision, and conversely intended to implement the

---

[3] "26. <u>Entire Agreement</u>.  This Agreement constitutes the entire understanding between the parties as to the subject matter of the Agreement, and supersedes all prior discussions, agreements and understandings, whether verbal or written."

[4] Defendant does not, in the Motion *sub judice*, seek summary judgment on the claim of an affirmative misrepresentation made in ¶170 of the First Amended Complaint or on the alleged fraudulent omission with respect to the Seed Program made in ¶173.  See Motion, Doc. No. 79, at 11, n. 7.

> Marketing Program and the Seed Program for its
> exclusive benefit.

(First Amended Complaint, Doc. No. 41).

The elements of an action in fraud in Ohio are (a) a representation or, where there is a duty

to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely,

with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true

or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon

it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury

proximately caused by the reliance. *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 514 N.E.

2d 709 (1987), citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St. 3d 69, 491 N.E. 2d 1101, ¶2

of the syllabus (1986); and *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 462 N.E. 2d 407 (1984).

Defendant seeks summary judgment because (1) it asserts it had no fiduciary relationship

with Plaintiffs which would have given rise to a duty to disclose and (2) the alleged fraud is squarely

contradicted by the written terms of the agreement entered into.  (Motion, Doc. No. 79, at 11-12.)

As implied by the Court's analysis of the contract above, the Court does not find that the asserted

fraud (failure to disclose an intent to divert customers to other grain processing facilities) is squarely

contradicted by the Thru-Put Agreement.  Defendant's second argument is therefore unavailing.

Plaintiffs admit that the real issue is "whether CGB had a duty to disclose its diversion plan

with [sic] Plaintiffs. . . ."  (Memorandum in Opposition, Doc. No. 90, at 31.)  To establish such a

duty, Plaintiffs rely on their analysis of the Thru-Put Agreement as establishing such a duty because

it was "an exclusive right contract." *Id*. at 32.  For the reasons set forth above in the Court's analysis

of the Thru-Put Agreement, it is unlike the exclusive sales contracts or marketing contracts on which

Plaintiffs rely by analogy.  It is entirely appropriate to imply a duty of best efforts when analyzing

an exclusive marketing contract such as that involved in the *Lucy, Lady Duff-Gordon* case, *supra*,

or when a realtor enters into an exclusive listing contract, when the seller is entirely dependent upon

the broker or marketer's effort to obtain any profit at all.  But under the Thru-Put Agreement,

Precision was to receive $250,000 (almost $70,000 more than it paid for the Facilities) whether

Consolidated put any grain through the Facilities or not.  There is nothing in the motion papers to

indicate that the Thru-Put Agreement was not arrived at by arms-length negotiations.  While Mr.

Martin could not have known of an intention by Consolidated to divert customers (if such an

intention existed), he certainly knew or could have learned of Consolidated's capacity to service

such customers at other locations and could have bargained for what he claims he got: either a best

efforts obligation by Consolidated or at least a non-compete for grain originating "in the area."

There is no basis for the Court to impute a fiduciary duty to Consolidated under the circumstances

which have been revealed in the motion papers.  In the absence of such a duty, Defendant is entitled

to summary judgment on those portions of the fraud claim on which it has sought that relief.

**Sixth Claim for Relief: Monopolization and Attempted Monopolization in Violation of the Sherman Act, 15 U.S.C. §2.**

In their Sixth Claim for Relief, Plaintiffs assert that Defendant has violated §2 of the

Sherman Act:

> 195.  CGB's solicitation of a "partnership" relationship with Mr. Martin/Precision for the clandestine purpose of obtaining unfettered access to the Facilities Customers, and CGB's execution of the Agreement with Precision whereby CGB was granted the exclusive right to control, use, and purchase grain from [sic] the Facilities, all as alleged above, were undertaken by CGB to monopolize, or in an attempt to monopolize, the marketing and distribution of grain throughout Greene County, Ohio, in violation of 15 U.S.C. §2.

(First Amended Complaint, Doc. No. 41, at 33.)

16

"Section two of the Sherman Act prohibits illegal monopolization. Illegal monopolization consists of '(1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident.'"  *Tarrant Serv. Agency v. American Standard*, 12 F. 3d 609, 613 (6th Cir. 1993), *quoting United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966).  "A claim for attempted monopolization under section two of the Sherman Act requires: (1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success." *Id*. at 615, citing *Arthur S. Langenderfer, Inc. v. S.E. Johnson, Co.*, 917 F.2d 1413, 1431 (6th Cir. 1990), *cert. denied*, 116 L. Ed. 2d 29, 112 S. Ct. 51 (1991).

Defendant first asserts that Plaintiffs' Sherman Act claim is precluded by Judge Rose's ruling on its first Motion for Partial Summary Judgment which precluded Plaintiffs from proving that they had an oral partnership agreement with Consolidated and dismissed the tortious interference claim (Motion, Doc. No. 79, at 14).  The Court, however, agrees with Plaintiffs that Judge Rose's prior rulings are not dispositive of the Sherman Act claim.

Defendant also asserts that Plaintiffs have failed to define a relevant market for purposes of its §2 claim.  It notes that the Sixth Circuit has held that the burden of defining the relevant market is on the plaintiff in a Sherman Act case.  (Motion, Doc. No. 79, at 15, citing *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 962 (6th Cir. 2004)).  In that case, the Sixth Circuit also held:

> "In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." United States v. E.I. du Pont De Nemours & Co., 351 U.S. 377, 395, 100 L. Ed. 1264, 76 S. Ct. 994 (1954). The "relevant market encompasses

17

> notions of geography as well as product use, quality, and description." Nat'l Hockey League, 325 F.3d at 719 (quoting Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001) (internal quotation marks omitted)). Relying on du Pont, this court has found the "reasonable interchangeability" standard to be the essential test for ascertaining the relevant product market test. White & White, Inc., 723 F.2d at 500. Reasonable interchangeability "may be gauged by (1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." Id. (citation omitted).

*Id.* at 961.

In his deposition, Mr. Martin defined the relevant product as "a local county [grain] elevator that provides all kinds of services to the local community pertaining to the grain business. They provide the marketing, they provide storage, they provide as many things to serve the needs of basically providing that paycheck to the farmer." (Martin Depo. at 99-100). With respect to geographic market, Mr. Martin described Greene County, the southwestern part of Fayette County, the northwestern part of Clinton County, and some portion of Clark County, all in Ohio. *Id*. at 100-101. He further testified that farmers who utilize the Facilities can also do similar business with Central Soya/Bunge, which has locations in both Clinton and Fayette Counties; Country Mart, which has locations in both Greene and Clark Counties; Cargill, which has locations in both Fayette County and on the river in Cincinnati (Hamilton County); and Consolidated's Riverside facility on the river in Cincinnati. *Id*. at 113-121. Mr. Martin also admitted that he has no idea what percentage of farmers in Greene County now bring their business solely to Consolidated on the river as opposed to the other market participants. *Id*. at 115-117.

In opposing summary judgment on the Sherman Act claim, Plaintiffs point out that Consolidated advertised its work with Precision by saying the Facilities were necessary. This evidence does nothing to define the relevant market so as to show Consolidated had monopoly

18

power or that there was a dangerous probability it would achieve that power in that market. It is probative on the issue that the Facilities were useful to Consolidated in competing in Greene County, but it does not show the Greene County market for grain elevator services was somehow distinct from a broader geographic market.

Plaintiffs also rely on Mr. Martin's deposition testimony. In it, he indicates he is not claiming that all of Greene County is the relevant market, "because transportation costs dictate a lot of the pricing." (Martin Depo. at 103.) He also indicates that the choices of small farmers or very small farmers are more limited in this regard. *Id*. at 105-106. He testified that the "majority" of Greene County's 300 farmers are small in the sense that he intended. *Id*. Plaintiffs' counsel then recasts the market definition as the "Greene County farmers, and only Greene County farmers," that are too small to have a choice, based on the economics of farming and transporting grain, to go anywhere else other than the Facilities in Bowersville or Jamestown." (Memorandum in Opposition, Doc. No. 90, at 38.)

This market definition makes logical sense. That is to say, if a farmer cannot sell anywhere besides one of these two grain elevators, there is no reasonably interchangeable provider of grain elevator services. If someone wanted to monopolize the market thus defined, the way to do it would be to acquire exclusive use of the Facilities. While this is not the market definition pled in the First Amended Complaint, the Court cannot say at this point that an amendment to that effect would somehow prejudice Defendant, if it were offered. The Court also cannot say whether a market thus defined is a relevant market for Sherman Act purposes, because the instant Motion raises only the question of adequate market definition. On that basis, the instant Motion for Partial Summary Judgment must be denied.

19

**Conclusion**


Defendant's second Motion for Partial Summary Judgment as to Plaintiff's breach of contract claim (First Claim for Relief)  for failure to use best efforts and/or for diverting customers from the Facilities is granted.  Defendant's second Motion for Partial Summary Judgment as to Plaintiff's fraud claim (Fourth Claim for Relief) for failure to disclose its intention to divert customers from the Facilities, to use the Customer Lists for that purpose, and to use the Marketing Plan for its exclusive benefit is granted.  Defendant's second Motion for Partial Summary Judgment as to Plaintiff's Sherman Act claim (Sixth Claim for Relief) is denied.


March 30, 2006.

s/ Michael R. Merz
Chief United States Magistrate Judge
